IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FUNDAMENTAL INNOVATION SYSTEMS INTERNATIONAL, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:17-CV-1827-N |
| ZTE CORPORATION, ZTE (USA), INC., and ZTE (TX), INC., | § § § | |
| Defendants. | § § § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants ZTE Corporation, ZTE (USA), Inc., and ZTE (TX), Inc.'s (collectively, "ZTE") motion to strike [173] and Plaintiff Fundamental Innovation Systems International, LLC's ("FIS") motion to strike [176]. For the reasons below, the Court denies both ZTE and FIS's motions to strike.

## I. ORIGIN OF THE DISPUTE

At its core, this dispute is about the alleged infringement of several utility patents covering USB technology that enables data communication in wireless devices and charging methods for those devices. Compl. at 3 [1]. FIS alleges that the relevant technology was initially developed by BlackBerry Ltd. ("BlackBerry") and is now licensed by FIS. *Id.* In December 2015, FIS notified ZTE that it believed ZTE was infringing several of its patents covering the USB technology. *Id.* at 4. FIS subsequently filed this action, alleging ZTE's products, primarily wireless mobile devices and charging adaptors, infringed five patents: U.S. patent numbers 8,232,766 ('766 patent); 7,834,586 ('586

patent); 7,239,111 ('111 patent); 8,624,550 ('550 patent); and 7,893,655 ('655 patent). Defs.' Brief Resp. Pltf.'s Mot. Strike 2 [196]. ZTE and FIS now both seek to strike portions of the opposing party's expert witnesses' testimony.

## II. LEGAL STANDARDS

### A. Motion to Strike Expert Testimony

Federal Rule of Evidence 702 provides that a qualified expert may testify if the expert's specialized knowledge will aid the trier of fact and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. *Daubert v. Medical Dow Pharmaceutical* requires district courts to determine that expert testimony "is not only relevant but reliable" and make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Med. Dow Pharm.*, 509 U.S. 579, 589, 592–93 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (making the *Daubert* principles applicable to all expert testimony). The focus, however, "must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert*, 526 U.S. at 595.

The *Daubert* inquiry may not replace the adversarial system or a trial on the merits. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002). When the expert's "methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold)

may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) (internal citations omitted). Expert testimony should not be excluded "simply because it was based on [one party's] version of the contested facts." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392–93 (Fed. Cir. 2003).

### B.  Patent Damages

A patentee is entitled to damages for patent infringement "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35. U.S.C. § 284.  To ascertain a reasonable royalty, litigants commonly use the hypothetical negotiation approach, which assumes the asserted patent claims are valid and infringed. *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The hypothetical negotiation calculates a reasonable royalty by approximating "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Id.*

### C.  Timely Evidence Disclosure

The Federal Rules of Civil Procedure require litigants to timely disclose evidence to party opponents.  Parties must make expert disclosures "at the times and in the sequence that the court orders." FED. R. CIV. P. 26(a)(2)(D).  A party who fails to provide information required by Rule 26(a) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

### III. THE COURT DENIES ZTE'S MOTION TO STRIKE

ZTE's motion seeks to strike portions of the expert report by FIS's damages expert, Mr. Weinstein ("Weinstein"). The parties do not dispute the methodology Weinstein used to calculate a base licensing fee from FIS's existing licenses, which was also used by ZTE's damages expert. Pltf.'s Resp. Defs.' Mot Strike 4–5 [191]; Defs.' Reply Support Defs.' Mot. Strike 1 [203]. Rather, ZTE's core argument is that the way Weinstein applies the estimated royalty rate to ZTE's products — to both devices and chargers individually — is unreliable and impermissibly doubles FIS's damages. FIS counters that ZTE is objecting to Weinstein's interpretation of the facts underlying his conclusions and that his testimony should be weighed by the jury. The Court agrees with FIS.

FIS's damages expert used a two-step process to calculate damages. First, Weinstein created an "equivalent ZTE royalty rate" through reference to existing FIS licenses.[1] Defs.' Mot. Strike 3 [173]. To do this, he calculated per-unit royalty rates for products sold under twenty-two of FIS's existing licenses. Pltf.'s Resp. Defs.' Mot. Strike 6 [191]. For any licensee selling "bundled" devices and charging adaptors together, Weinstein's calculations treated the products as a single "unit." Defs.' Mot. Strike 5 [173]. He averaged these royalty rates to obtain a starting point royalty rate, which he then adjusted based on various factors to arrive at his equivalent ZTE royalty rate. *Id.* Second,

---

[1] FIS has twenty-five licensees, but three of its licensing agreements were reached through settlements to litigation. Pltf.'s Resp. Defs.' Mot. Strike 8 [191]. Due to the unique factors and risks posed by pending litigation, Weinstein excluded these licensees from his initial starting point royalty fee calculation. *Id.* Consequently, any differences in FIS's licensing arrangements with these three licensees and Weinstein's application of his estimated royalty rate to ZTE in his construct of the hypothetical negotiation are irrelevant.

Weinstein applied the equivalent royalty rate to ZTE's accused products. When he did so, he treated mobile devices and USB charging adaptors as separate "units," though ZTE "bundles" these products together. *Id.* at 6.

ZTE contends that because all FIS's licensees were given a "bundled rate" — devices packaged with charging adaptors were counted as one unit — Weinstein's treatment of ZTE's bundled products as two separate units is inconsistent. Further, ZTE claims that Weinstein's justification for this approach impermissibly references the current litigation between ZTE and FIS in contravention of the requirements for the hypothetical negotiation.

FIS claims that the "bundled rate" offered to its licensees was a discount and that experts are not required to assume discounts in real-world licensing agreements would apply in the hypothetical negotiation.[2] FIS argues that it is permissible to assume there are reasons the discount FIS offered its licensees would not have been offered to ZTE in a hypothetical negotiation. This is particularly true, FIS argues, because the proper parties to this negotiation would have been ZTE and BlackBerry, not ZTE and FIS, as BlackBerry owned the patent when ZTE first allegedly infringed it. Pltf.'s Resp. Defs.' Mot Strike 10 [191].

---

[2] FIS also argues that only three of the twenty-two licensees considered by Weinstein sell bundled products. Pltf.'s Resp. Defs.' Mot. Strike 1 [191]. ZTE contends that all twenty-two licensees do so. Defs.' Reply Support Defs.' Mot. Strike 6–8 [203]. The number of licensees selling bundled products is irrelevant to the resolution of ZTE's motion, however, because FIS's primary argument — that any discounts offered to FIS licensees would not necessarily apply in a hypothetical negotiation with ZTE — would apply regardless of how many of its licensees it offered bundled rates.

While ZTE's expert may dispute that assessment, the Court agrees that Weinstein's conclusion is based on underlying facts regarding whether the bundled rate offered to FIS's licensees would reasonably have been offered to ZTE or whether factors suggest it would have been given a different licensing agreement. As such, Weinstein's theory should be presented to the jury, which can weigh Weinstein's testimony and determine whether it is credible. *See Pipitone*, 288 F.3d at 249–50 ("[A] trial court must take care not to transform a *Daubert* hearing into a trial on the merits"). The Court thus denies ZTE's motion to strike FIS's damages expert's market approach damages theory.

## IV. THE COURT DENIES FIS'S MOTION TO STRIKE

FIS asks the Court to strike portions of ZTE's technical expert's rebuttal report and portions of ZTE's damages expert's rebuttal report that rely on the former. In its motion to strike, FIS claims that ZTE's experts introduced three new arguments — noninfringement, noninfringement alternatives, and invalidity theories — that had not been timely disclosed. ZTE argues that the challenged portions are either based on previously disclosed arguments or are made in response to FIS's expert's testimony. The Court agrees with ZTE.

### A. Noninfringement

The noninfringement argument at issue relates to claim limitations of the '111 patent requiring that an identification signal be generated. Defs.' Brief Resp. Pltf.'s Mot. Strike 5 [196]. FIS submitted interrogatories requesting that ZTE identify the patent claim elements that ZTE contends are not met by its accused products. Brief Support Pltf.'s Mot. Strike 3 [177]. In response, ZTE disclosed multiple claim limitations of FIS's '111 patent,

each addressing an "identification signal," that ZTE argued were not practiced by its accused products. *Id.* None of these disclosures used the words "generate" or "generating." *Id.* at 4. ZTE's technical expert, Mr. Shoemake ("Shoemake"), later asserted in his rebuttal report that ZTE's accused products did not satisfy the identification signal limitation and that the products were unable to "generate" such a signal. Defs.' Brief Resp. Pltf.'s Mot. Strike 6 [196].

FIS claims that Shoemake presented a new noninfringement argument regarding the '111 patent claim limitation on "generating" an identification signal and that he untimely raised it for the first time in his expert rebuttal report. ZTE argues that Shoemake's testimony is just an explanation of its previously disclosed noninfringment argument because one of the reasons its accused products lack the identification signal, as it initially argued, is that no signal is ever "generated."

The Court agrees that Shoemake's testimony that the accused products cannot "generate" an identification signal is part and parcel of the same argument ZTE initially disclosed: that its accused charging adaptors do not have the identification signal claimed by the '111 patent. Additionally, ZTE has noted, and FIS does not deny, that each of the '111 patent's asserted claims both require an identification signal and require that this signal be "generated." Defs.' Brief Resp. Pltf.'s Mot. Strike 5 [196]. Thus, ZTE's response to FIS's interrogatories — stating that the '111 patent limitations involving an identification signal were not practiced by its accused products — should have put FIS on notice that one reason it might use to support this noninfringement argument is that its accused products, unlike FIS's '111 patent, cannot "generate" the required identification

signal.  The Court consequently denies FIS's motion to strike portions of Shoemake's rebuttal report addressing noninfringement.

### B.  Noninfringement Alternatives

FIS also seeks to exclude ZTE's expert testimony regarding noninfringment alternatives.  FIS alleges that, even though ZTE represented in its discovery responses that it did not intend to rely on any noninfringing alternatives, Shoemake included noninfringing alternatives opinions in his expert report.  Further, FIS claims that ZTE's damages expert, Mr. Lasinski ("Lasinski") relied on Shoemake's noninfringement alternatives to form part of his rebuttal damages report.  ZTE argues that its experts are simply responding to analysis by FIS's expert, Dr. Conte ("Conte").  The Court agrees with ZTE and declines to strike these portions of its expert reports.

FIS's expert, Conte, provided testimony regarding alleged benefits of FIS's patents and costs of alleged noninfringing alternatives, including costs of components to these alternatives.  Defs.' Brief Resp. Pltf.'s Mot. Strike 4 [196]; App. Support Pltf.'s Mot. Strike 241–44 [178].  Shoemake and Lasinski both disputed the cost of the alleged noninfringing alternative that was raised by Conte.  Specifically, Shoemake argued that Conte did not consider lower-cost component parts in calculating the cost of a noninfringing alternative, App. Support Pltf.'s Mot. Strike 243–44 [178], and Lasinski relied on Shoemake's contentions.  *Id.* at 542, 568.  This expert testimony does not raise a new noninfringement alternative or affirmatively rely on noninfringement alternatives.  Rather, ZTE's experts are directly responding to a theory originally proffered by FIS's expert.  The Court thus denies FIS's motion to strike these portions of the expert reports.

### C. Invalidity

FIS claims that Shoemake disclosed invalidity arguments regarding the '655 patent for the first time in his noninfringment rebuttal report, despite stating in his opening expert report on invalidity that he was not asked to opine on the invalidity of the '655 patent. Pltf.'s Brief Support Mot. Strike 2 [177]. ZTE responds that Shoemake was rebutting Conte's characterization of the invention and its purported benefits rather than offering an invalidity opinion. Defs.' Brief Resp. Pltf.'s Mot. Strike 5 [196]. The Court agrees with ZTE. Shoemake's expert report argues that the benefits Conte claims for the '111 patent should be attributed to prior art rather than to FIS's patent. App. Support Pltf.'s Mot. Strike 245–46 [178]. This opinion is offered to rebut an opinion initially raised by FIS's own expert and is not arguing that the '655 patent is invalid.[3] The Court thus declines to strike this testimony.

### CONCLUSION

The Court denies both ZTE and FIS's motions to strike expert testimony.

Signed November 14, 2019.

_David C. Godbey_
United States District Judge

---

[3] Further, ZTE has reaffirmed that it will not raise an invalidity argument regarding the '655 patent at trial. Defs.' Brief Resp. Pltf.'s Mot. Strike 9 [196].